UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ENSCO OFFSHORE CO.                                    CIVIL ACTION

VERSUS                                                NO. 10-1941

KENNETH LEE SALAZAR, ET AL                            SECTION "F"

ORDER AND REASONS

Before the Court are cross-motions for partial summary judgment. Both parties' motions are DENIED without prejudice as to Count II. The plaintiff's motion is GRANTED and the government's motion is DENIED as to Count III.

**Background**

This case is the second that arises from a government moratorium on deepwater drilling in the Gulf of Mexico. The plaintiff in this case supplies offshore drilling and related services to the oil and gas industry and owns and operates mobile offshore drilling units in the Gulf. It challenges a notice issued to lessees and operators on June 8, 2010 and the second six-month blanket moratorium on offshore drilling operations of deepwater wells that was ordered on July 12, 2010 by the Department of the Interior and the Bureau of Ocean Energy Management, Regulation, & Enforcement.

These agency decisions were set in motion by the disastrous Deepwater Horizon drilling platform explosion in the Gulf on April 20, 2010, and the resulting massive oil spill. In response to this

1

unprecedented disaster,[1] the President of the United States created a bipartisan commission-the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling-and charged it with examining the facts and circumstances concerning the cause of the blowout.  The President also ordered the Secretary of the Interior to conduct a thorough review of the Deepwater Horizon blowout and to report, within thirty days, "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."

A thirty-day examination was conducted in consultation with experts from state and Federal governments, academic institutions, and industry and advocacy organizations.  On May 27, 2010, the Secretary issued a report, which examined deepwater drilling operations in the Gulf and recommended immediate and long term reforms to improve drilling safety.  In the Executive Summary to the report, the Secretary recommended "a six-month moratorium on permits for new wells being drilled using floating rigs."  He included "an immediate halt to drilling operations on the thirty-

---

[1] The all too familiar details include the tragic death of eleven crew members, many injured workers, a broken pipe on the sea floor that spewed crude oil into the Gulf (estimates range from 35,000 to 60,000 barrels per day), and oil that has spread across thousands of square miles damaging sensitive coastlines, wildlife, and the intertwined local economies.  As a result, nearly one-third of the Gulf of Mexico was closed to commercial and recreational fishing.

three permitted wells, not including relief wells currently being drilled by BP, that are currently being drilled using floating rigs in the Gulf of Mexico." All deepwater drilling operations by all companies, not just BP (the leaseholder of the well that blew), were blocked.

The day after issuing the report, the Secretary directed the Minerals Management Service—now the Bureau of Ocean Energy Management (BOEM)—to issue a six-month blanket moratorium on pending, current, and approved offshore drilling operations involving deepwater wells. "Deepwater" was defined as deeper than 500 feet. BOEM executed the moratorium by sending temporary suspension letters to each affected operator. To address the report's other recommendations that he asserted warranted immediate implementation, the Secretary issued a notice to lessees, No. 2010-N05, (NTL-05), that applies to all activities, in shallow water and deep, in the Outer Continental Shelf. In the NTL-05, BOEM instructed all federal oil and gas lessees and operators of ten new safety measures, drawn from the May 27 report, with which they must comply. These new requirements range from submitting certifications to performing additional safety procedures.

The first moratorium was soon challenged in this Court. After an expedited hearing, the Court enjoined the moratorium because the government failed to show any rational nexus that supported a blanket moratorium on all deepwater drilling activities when only

3

two of the other many deepwater operators had even minor infractions.  After the first blanket moratorium was enjoined, the Secretary of Interior instructed employees of his department not to implement it pending an appeal, but also immediately publicly announced his intention—in sworn testimony before the Senate and in a press release—to restore the blanket moratorium.[2]  The new moratorium, he claimed as justification, would account for the deficiencies this Court found in the first.  On July 8, 2010, the U.S. Court of Appeals for the Fifth Circuit rejected the government's appeal, over one dissent.  Four days later, on July 12, 2010, the Interior Secretary issued a twenty-two page decision memorandum rescinding the first moratorium and directing the BOEM to withdraw the "suspension" letters issued under it, but at the same time ordering it to issue new blanket suspensions based on the second moratorium.  This second moratorium facially purported to apply to all rigs that use sub-sea blowout preventers or surface blowout preventers on a floating facility and applies through November 30, 2010.  In reality, the new moratorium covered precisely the same rigs and precisely the same deepwater drilling activities in the Gulf of Mexico, until the same termination date,

---

[2] In a press release issued the day of the Court's injunction, the Secretary announced he would "issue a new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."  When asked at a Senate Committee hearing the next day if he planned to issue a new moratorium on all exploration of oil in the Gulf of Mexico in depths of over 500 feet, the Secretary responded he did.

as did the first.

The second moratorium, along with the NTL-05, soon faced the present court challenge.  Ensco furnishes offshore drilling and related services to the oil and gas industry and owns and operates mobile offshore drilling units around the world, including in the Gulf of Mexico.  Pointing to direct harm to its business and harm to its employees as a result of a second (and substantively identical) moratorium, Ensco sued the government on July 9, 2010. It challenged both the second moratorium and NTL-05 in its First Amended Complaint on July 20, 2010, and filed its motion for partial summary judgment on Counts II and III of this complaint. The government responds in opposition to the plaintiff's motion for partial summary judgment and answer with a cross-motion for partial summary judgment on the same counts.  Counts II and III challenge the issuance of the second moratorium and NTL-05, respectively.

Before this Court could rule on these issues, and on the very date additional briefing to the Court was due, the government lifted the second moratorium.  As a result, the government urges in a separately-filed motion to dismiss that the plaintiff's motion for summary judgment on Count II is now moot.  Because Count II will be addressed in a separate ruling[3] on the defendant's motion

---

[3] The government's motion also calls for the dismissal of Count I as moot.  Count I challenges both the first and second moratoriums as unlawful.  The Court will consider Counts I and II together on November 3 in a hearing on the papers.

to dismiss, both parties' cross-motions are DENIED without prejudice as to Count II.  Plaintiff's challenge to the NTL-05, the subject of the parties' cross-motions, presents a separate controversy and a solemn issue.  The Court resolves it now.

### Law and Analysis

I. Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the

allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  He instead must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.

                                II.

   Because the plaintiff supplies offshore drilling and related services to the oil and gas industry in the Gulf, but is not a "lessee" or "operator" under OCSLA, the government maintains that the plaintiff lacks standing to challenge the NTL-05.  The government proposes that any time the Department of Interior issues a notice to lessees and operators regarding protection of person, property, or the environment, it implicitly invokes a clause in an individual lease; only lessees and operators, the government urges, have standing.

   The plaintiff responds that it has standing.  It is irrelevant, the plaintiff insists, that standard lessee contracts are written in a way to accommodate the Secretary's statutory authority under OCLSA.  What is relevant for the purposes of standing, the plaintiff urges, is that its claims directly arise

                                 7

from the government's exercise of its statutory authority over the plaintiff's core business activity. The plaintiff pointed out during oral argument that it, rather tellingly, is among the regulated parties identified as subject to the NTL-05 on the government's website.

Straying from its standing argument, the government insists that the NTL-05 represents a valid exercise of the Department of Interior's authority under OCSLA; that the NTL-05 amounts to an interpretative rule (not a substantive one) that requires no notice or opportunity for comment. The plaintiff disagrees and responds that the NTL-05 must be set aside because it imposes new, substantive drilling requirements without having first provided the requisite notice or opportunity for comment as required by law.

### III. OCSLA

The Outer Continental Shelf Lands Act governs federal offshore oil and gas exploration. 43 U.S.C. § 1331(a) (2006). OCSLA describes the Outer Continental Shelf as "a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safe-guards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). In enacting OCSLA, Congress expected that drilling operations would employ "technology, precautions, and techniques sufficient to prevent or minimize the likelihood of

blowouts, loss of well control, fires, spillages, . . . or other occurrences which may cause damage to the environment or property." Id. § 1332(6).

OCSLA's regulations permit BOEM to "clarify, supplement, or provide more detail" about regulatory requirements, or outline what information a lessee must provide in its submissions to BOEM, through Notices to Lessees and Operators.  30 C.F.R. § 250.103.

### IV.  The Administrative Procedure Act

#### A.  Standing

This Court is tasked to act as a reviewing court in these cases.  The Administrative Procedure Act authorizes judicial review of final agency action where there is no other adequate remedy in a court.  5 U.S.C. §704; see id. §702 ("A person suffering a legal wrong because of agency action . . . is entitled to judicial review thereof.").[4]  This right of review "applies universally 'except to the extent that (1) the statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'"  Bennett v. Spear, 520 U.S. 154, 174 (1997).  Standing in such cases is informed by the parameters of the litigant's interest in the

---

[4] The APA does not provide an implied grant of subject matter jurisdiction. Califano v. Sanders, 430 U.S. 99, 107 (1977). However, the plaintiffs' claims of injury caused by the government's violation of OCSLA are subject to this Court's federal question jurisdiction. See 28 U.S.C. §1331.

9

controversy.  What has been characterized as the zone of interests test.

The APA "serv[es] a broad remedial purpose."  <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 156 (1970).  The zone of interests test as applied in APA cases is similarly broad.  <u>See</u> <u>Clarke v. Sec. Indus. Ass'n</u>, 479 U.S. 388, 399 (1987).  Even when the claimant "is not itself the subject of the contested regulatory action," standing under the zone of interests test fails to lie only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assured Congress intended to permit the suit."  <u>Id.</u>  With these injunctions in mind, the Court finds that Ensco, directly affected by NTL-05, has standing to assert its claim.

B.   The Count III Challenge

The APA instructs that agency action may be set aside where promulgated "without observation of procedure required by law."  5 U.S.C. 706(2)(D).  The APA requires agencies to promulgate rules only after giving the public notice and an opportunity to comment.[5]  Notice and comment are not required for all promulgated rules,

---

[5] The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. § 551(4).  Its text, its instructions, are clear and direct.  That the NTL-05 is a "rule" is not at issue.

however; the APA exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," or "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b). "[T]he label that the particular agency puts upon its given exercise of administrative power is not . . . conclusive; rather it is what the agency does in fact." Phillips Petroleum Co. v. Atlantic Richfield Co., 22 F.3d 616, 619 (5th Cir. 1994) (internal quotations omitted).

OCSLA authorizes the government to issue the NTL-05. See 30 C.F.R. § 250.103. But this permission has limits; it cannot escape the APA. The parties do not dispute that the NTL-05 is a rule; their disagreement rests on whether the rule is substantive, requiring notice and comment, or simply interpretative, requiring neither notice nor comment. Because the NTL-05 was issued without notice or comment, it may be upheld only if it is an interpretative rule, as the government contends.

The difference is significant. Interpretative rules typically clarify statutory terms, reiterate existing statutory duties, or track statutory language, and thus do not require notice or comment. Phillips Petroleum, 22 F.3d at 619. Substantive rules, on the other hand, supplement existing law and typically impose

11

additional duties or requirements. <u>Davidson v. Glickman</u>, 169 F.3d 996, 999 (5th Cir. 1999) (internal citations and quotations omitted); <u>see</u> <u>Nat'l Family Planning & Reprod. Health Servs. v. Sullivan</u>, 979 F.2d 227, 229-31 (D.C. Cir. 1992) (overturning regulations issued without notice and comment that neither clarified nor explained but rather amended a preexisting regulation).

It seems unrestrained by the facts before the Court to characterize the government's edicts as interpretative. That the notice is called a "guidance document" is wishful at best. <u>See</u> <u>Phillips Petroleum</u>, 22 F.3d at 619. The NTL's requirements in practice fit well within the APA's definition of a substantive rule as understood by the courts. <u>See</u> <u>Davidson</u>, 169 F.3d at 999; <u>Nat'l Family Planning</u>, 979 F.2d at 229-31. The NTL-05 imposes additional duties on operators and lessees; it mandates new certifications and safety inspections that were not in place before; it does not simply track statutory language or reiterate existing duties. It is, by its very thrust, substantive. Notice and comment were required by law. The government did not comply, and the NTL-05 is of no lawful force or effect.

Accordingly, the plaintiff's motion for partial summary judgment is GRANTED as to Count III. The government's cross-motion for partial summary judgment is DENIED as to Count III. Both parties' motions are DENIED without prejudice as to Count II.

New Orleans, Louisiana, October 19, 2010.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE