UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ENSCO OFFSHORE CO., ET AL                    CIVIL ACTION

VERSUS                                       NO. 10-1941

KENNETH LEE "KEN" SALAZAR,                   SECTION "F"
ET AL

<u>ORDER & REASONS</u>

Before the Court is plaintiff's pending motion for preliminary injunction, which, after oral argument, the Court denied without prejudice on January 13, 2011 and ordered supplemental briefing. The Court now RESCINDS and VACATES its previous Order[1] and GRANTS the plaintiff's motion.

**<u>Background</u>**

After Deepwater Horizon's explosion and the catastrophic oil spill that followed, the Secretary of Interior twice in succession imposed a blanket moratorium on deepwater drilling in the Gulf of Mexico. For the five months that the bans were in place, no permits were issued for deepwater drilling. But, even after the Secretary formally lifted the second moratorium on October 12, 2010, permits for deepwater drilling activities have not been processed; little to no deepwater drilling has resumed.[2]

---

[1] The January 13, 2011 Order (Dkt. No. 180) is VACATED only to the extent that it applies to the plaintiff's motion for preliminary injunction as to Count IV (Dkt. No. 139).

[2] Permitting for shallow water drilling also has suffered delays.

1

In the past ten months, the Department of Interior and the Bureau of Ocean Exploration Management, Regulation, and Enforcement (BOEMRE) have been centrally involved in plugging the culprit well and clearing the Gulf of millions of gallons of renegade oil.  The government, as a result of the spill, adopted new regulations covering drilling in the Gulf of Mexico.  Operators seeking permits to drill must comply with some of these new regulations before their permit applications may be processed.  Beyond these new regulations, permit applications are also subject to the requirements of the National Environmental Policy Act.  Plaintiff charges the government's continuous delays are intentional.  The government responds that its strained resources and the demands of regulatory compliance necessarily produce the delays at issue.

Seeking action (any action) from the government, Ensco sought a preliminary injunction on five specific permit applications in which the company holds a contractual stake:  Cobalt's application for a permit to drill on GC 814 using ENSCO 8503, filed April 30, 2010; Cobalt's revised application for a permit to drill on GB 959 using ENSCO 8503, filed October 21, 2010; Nexen's application to drill filed July 27, 2010; and two other applications filed by Nexen on October 12, 2010.  The government contends that four of these permits are not technically pending before it because they were returned to the applicants with instructions to correct certain deficiencies.  But Cobalt attests that it has not received

any indication from the government about inadequacies in its permit applications and that BOEMRE merely contacted Cobalt to inform it that its application would move to the end of the queue because of Ensco's sublease of a relevant rig to an operator in French Guiana.

It is undisputed that before the Deepwater Horizon disaster, permits were processed, on average, in two weeks' time.  In stark contrast, the five permits at issue have been pending from four to some nine months.[3]  It is also undisputed that these delays have put off indefinitely drilling in the Gulf of Mexico.  Ensco has incurred significantly reduced standby rates on its rigs and has been forced to move some of its rigs to other locations around the world.  It is unclear when Gulf drilling will resume.  The government's assurances have been inconsistent.

At the outset, the Court denied the plaintiff's motion for a preliminary injunction because the Court had questions about whether it has the judicial review authority to impose a time frame for agency decision and, if so, what a reasonable time frame would be to mandate government action, whether it be denial or approval of permit applications.  The parties' supplemental briefing has resolved the Court's questions; the Court now RESCINDS and VACATES its Order denying without prejudice a preliminary injunction and GRANTS the plaintiff's motion for a preliminary injunction as to

---

[3]  Discounting the time the two moratoriums were in place, all five applications have suffered delays of at least four months.

3

Count IV, subject to the confines of this Order.

**Law & Analysis**

I.

The Court is sensitive to the unequaled remedy of the preliminary injunction. The "preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" Bluefield Water Ass'n v. City of Starkville, Miss., 577 F.3d 250, 253 (5th Cir. 2009) (quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003)); see also PCI Transport., Inc. v. Ft. Worth & W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005). "Mandatory preliminary relief . . . is particularly disfavored, and should not," we are instructed, "be issued unless the facts and law clearly favor the moving party." Martinez v. Matthews, 544 F.2d 1233, 1243 (5th Cir. 1976).

The Court can issue a preliminary injunction only if Ensco shows:

> (1) a substantial likelihood of prevailing on the merits;
> (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest.

Ridgely v. FEMA, 512 F.3d 727, 734 (5th Cir. 2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winters v. Natural Res. Def. Council, 129

4

S. Ct. 365, 376 (2008) (quoting <u>Amoco Prod. Co. v. Vill. of Gambell, Alaska</u>, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" <u>Id.</u> at 376-77 (quoting <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982)). Even if all persuasion elements are satisfied, an injunction remains "a matter of equitable discretion; it does not follow from [a substantial] success on the merits as a matter of course." <u>Id.</u> at 381; <u>see</u> <u>Romero-Barcelo</u>, 456 U.S. at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.").

The first question the Court must answer is whether the plaintiff has shown a substantial likelihood of success on the merits of Count IV.

## II.

## A.

## 1.

Section 706(1) of the Administrative Procedure Act proclaims a national policy and requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." <u>Id.</u> § 706(1); <u>see</u> <u>Telecommc'ns Research & Action Ctr. v. FCC</u>, 750 F.2d 70, 79 (D.C. Cir. 1984) ("Claims of unreasonable agency delay clearly fall into that narrow class of interlocutory appeals from agency action over which we appropriately should exercise our jurisdiction.").

The failure to act, as contemplated by Section 706, is "properly understood as a failure to take . . . agency actions (including their equivalents) . . . defined in § 551(13)." <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 62 (2004); <u>see</u> <u>Sierra Club v. Peterson</u>, 228 F.3d 559, 565 (5th Cir. 2000) ("Absent a specific and final agency action, [courts] lack jurisdiction to consider a challenge to agency conduct."). Section 551(13) defines final agency action as "the whole or a part of an agency rule, order, license, sanction, [or] relief." 5 U.S.C. § 551(13). The term "license" includes "the whole or a part of an agency permit." <u>Id.</u> at § 551(8). And so, agency delay in issuing or denying a permit, or the failure to act at all, is a final agency action made reviewable by the APA.

But although "[f]ailures to act are sometimes remediable under the APA," they are "not always" so. <u>SUWA</u>, 542 U.S. at 61. Section 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or to 'take action upon a matter, without directing how it shall act.'" <u>Id.</u> at 64 (quoting approvingly the Attorney General's Manual on the Administrative Procedure Act 108 (1947)) (emphasis removed). A Section 706(1) claim therefore "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." <u>Id.</u> (emphasis in original); Section 706 vests federal courts with the discretion to decide whether agency delay is

unreasonable "when an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time." Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999).  Anything less would paralyze the established judicial review authority fashioned by the APA.  Anything more would be an unacceptable disrespect for the institution of the separation of powers.

2.

The Court finds that the Outer Continental Shelf Lands Act (OCSLA) establishes a non-discretionary duty on the Department of the Interior to act, favorably or unfavorably, on drilling permit applications.  Although OCSLA grants the Secretary discretion to decide whether to review permit applications, see 43 U.S.C. § 1340(d), the Court holds that once the Secretary exercises that discretion, the government is under a duty to act by either granting or denying a permit application within a reasonable time. Not acting at all is not a lawful option.  To discharge the Secretary's oversight responsibility, without any time-sensitive obligation to do so, as the government now starkly urges, unmasks the fiction of transparency in government.

Not acting on permit applications seems contrary to OCSLA's command that drilling development be "expeditious," 43 U.S.C. § 1332(3), and the APA's command that a permit must be processed "within a reasonable time." 5 U.S.C. § 555; see Forest Guardians,

7

174 F.3d at 1190.    Together, OCSLA and the APA inform the government's action on permits and require that the government should act expeditiously to advance development in the Outer Continental Shelf, and not to curtail drilling unpredictably or indefinitely.

Because the Court holds that the government has a non-discretionary duty to act on the applications identified by the plaintiff in its motion for a preliminary injunction, and because it is beyond quarrel that the government has failed to act, the government's action on permit applications is judicially reviewable under Section 706(1).    See SUWA, 542 U.S. at 64.    Whether the plaintiff has established a "substantial likelihood of success on the merits" therefore turns on whether the government's delay in processing those permits is unreasonable.

B.

1.

To evaluate whether the plaintiff has met the "difficult burden" of showing that the government's delays on the five permit applications are unreasonable, Ingalls Shipbldg., Inc. v. Asbestos, 17 F.3d 130, 133 (5th Cir. 1994), the U.S. Court of Appeals for the D.C. Circuit has gathered a sextet of guiding factors.[4]   See id. at

---

[4]   The D.C. Circuit notes that these factors, developed to determine when a writ of mandamus should issue, are "hardly ironclad, and sometimes suffer from vagueness" but "nevertheless provide[] useful guidance in assessing claims of agency delay." Id. at 80.

8

80.

They are:

> (1) the time agencies take to make decisions
> must be governed by a "rule of reason[;]"
>
> (2) where Congress has provided a timetable or
> other indication of the speed with which it
> expects the agency to proceed in the enabling
> statute, that statutory scheme may supply
> content for this rule of reason[;]
>
> (3) delays that might be reasonable in the
> sphere of economic regulation are less
> tolerable when human health and welfare are at
> stake;
>
> (4) the court should consider the effect of
> expediting delayed action on agency activities
> of a higher or competing priority;
>
> (5) the court should also take into account
> the nature and extent of the interests
> prejudiced by delay; and
>
> (6) the court need not "find any impropriety
> lurking behind agency lassitude in order to
> hold that agency action is 'unreasonably
> delayed.'"

Id. (internal citations omitted).  Of these factors, the first is

the "most important." In re Core Commc'ns, Inc., 531 F.3d 849, 855

(D.C. Cir. 2008).  It is clear that "where Congress has provided a

timetable or other indication of the speed with which it expects

the agency to proceed in the enabling statute, that statutory

scheme may supply content for this rule of reason." TRAC, 750 F.2d

at 80.  What follows from these thoughts is that a timetable need

not be express for federal courts to find agency delay to be

unreasonable.

Applying its standard in In re Barr Laboratories, Inc. v. National Association of Pharmaceutical Manufacturers, 930 F.2d 72, 73 (D.C. Cir. 1991), the D.C. Circuit held that even though the Food & Drug Administration failed to comply with statutory deadlines for generic drug applications, equitable relief was inappropriate. The FDA had systematically delayed the processing of generic drug applications, blaming the lag on a scandal in its generic drug division, which forced some employees out and diverted others from their usual work. Although the court of appeals found that "judicial intervention could assist [the plaintiff], it would likely impose offsetting burdens on equally worthy generic drug producers, equally wronged by the agency's delay." Id. The "prompt disposition of [the plaintiff's] applications would benefit users of generic drugs," but disposition of other companies' applications would benefit users just as much; speeding up the process for the generic drug applicant would inevitably result in delays for other companies' applications. Id. Supporting this conclusion was the court's finding that "putting [the plaintiff] at the head of the queue simply moves all others back one space and produces no net gain." Id. at 75. But, the appeals court warned, had the plaintiff "shown that the FDA had singled it out for mistreatment, judicial relief would then advance the cause of equal treatment and, despite the lack of any immediate net advancement of Congress's policy objectives, could make sense." Id. The court

concluded that "especially shabby treatment of one applicant" would support a finding of egregiousness warranting judicial intervention.   <u>Id.</u>

Later, the U.S. Courts of Appeals for the Tenth Circuit was called on to evaluate the Environmental Protection Agency's failure to timely designate critical habitat for the endangered silvery minnow in <u>Forest Guardians v. Babbitt</u>, 174 F.3d 1178 (10th Cir. 1999).   Rejecting the Secretary of Interior's claim that a recently-lifted Congressional spending moratorium made the timely designation of critical habitat fiscally impracticable, the Tenth Circuit held that limited resources cannot excuse an agency's non-discretionary duty to act.[5]   <u>Id.</u> at 1191.

2.

OCSLA is silent as to the length of time required for permit applications to process; indeed it offers little guidance on permits in general.   But that does not mean this Court is powerless to act.   <u>See</u> <u>TRAC</u>, 750 F.2d at 80.   Beyond dispute is that before the Deepwater Horizon oil spill, permit applications were resolved in some two weeks.   Also clear is that the permit applications at issue here have experienced delays of four months, if not more. With this in mind, and in light of the <u>TRAC</u> insights, the Court

---

[5]    The Tenth Circuit recognized it "must consider resource availability," but it concluded that "the agency defense of unavailable resources must be reserved as a defense against contempt if an injunction issues."   <u>Id.</u> at 1189.

concludes that the time delays at issue here are unreasonable such that the plaintiff has established a substantial likelihood of success with respect to the five permits identified in its motion for a preliminary injunction.   But when must the government act?   And what clues do we have that might define what is reasonable?

Ensco urges the application of the thirty-day time period Congress has mandated in which BOEMRE must act to approve or deny exploration plans.   The Court agrees; it is a common sense marker "of the speed with which [Congress] expects the agency to proceed." TRAC, 750 F.2d at 80.   Why?   OCSLA structures four distinct stages in the administrative process:   (1) formulation of a five-year leasing plan by the Secretary; (2) lease sales; (3) exploration by the lessees; and (4) development and production.   Sec'y of the Interior v. Cal., 464 U.S. 312, 337 (1984).   The third and fourth steps are described in the statute at 43 U.S.C. § 1340(c) and (d). Section 1340(c) describes the approval process for an exploration plan in great detail:   Once submitted or modified, "[t]he Secretary shall approve [or deny] such plan, as submitted or modified, within thirty days of its submission."   Section 1340(d) explains that "[t]he Secretary may, by regulation, require any lessee operating under an approved exploration plan to obtain a permit prior to drilling any well in accordance with such plan."   Section 1340(d) speaks of no express time limit; but, indeed, it does not even require permits to issue at all.

The government offers its cramped statutory reading. The government maintains that Congress's decision to impose no time frame on BOEMRE's review of applications to drill was intentional—and thus blessed that the decision of whether to act on permit applications belonged to the unchecked whim of the administrative process. Its view would produce autocratic discretion at best. It seems to the Court that Congress anticipated a process that would generally embrace a rational time frame for agency action; one faithful to OCSLA's mandate of expeditious development. The thirty-day action period Congress imposed on the approval of drilling exploration plans, and the fact that Congress, through OCSLA, commands development to be expeditious, as a national policy, indicate that Congress gave its blessing to a time frame for action no longer than thirty days; the former two-week time processing period preceding the oil spill also confirms this.

The government urges that delays are inevitable in a more regulated environment; in the wake of the disastrous BP spill, some delays are of course understandable. But now, nearly a year after the spill occurred, delays, particularly those of the length at issue here, become increasingly unreasonable. BOEMRE has taken over management from a formerly crumbling and disreputable agency; the leaking culprit well has been contained; the revised regulations are no longer new; and the threat of rigs leaving the

Gulf becomes more forceful each day.   The permitting backlog becomes increasingly inexcusable.   Perhaps it is reasonable for permit applicants to wait more than two weeks in a necessarily more closely regulated environment.  Delays of four months and more in the permitting process, however, are unreasonable, unacceptable, and unjustified by the evidence before the Court.   Strained resources do not amend the government's duty to act on permit applications that pass before it.  Forest Guardians, 174 F.3d at 1191.  OCSLA's text infers that delays beyond thirty days are unreasonable; that a decision regarding all drilling activities should be made during a thirty-day period of scrutiny.  The Court concludes such delays contravene Congress's expression of a national purpose and OCSLA's overriding policy of expeditious development.

Unlike in Barr, it does not appear that ordering the government to act here would disrupt a queue; indeed, it appears that the government has considered no applications for any activities falling within the scope of the moratorium.  Where there should be a queue, there is instead an untended pile.  Finding that the government should act within thirty days on the five permits identified by plaintiff would not displace other permit applications, because it appears the government has neglected to act at all on permits that were once covered by its blanket

moratorium.[6]

Having concluded that the plaintiff has established a substantial likelihood of success on the merits, the Court turns to the remaining factors in its preliminary injunction analysis.

### III.

The Court concludes that the other requirements for a preliminary injunction are met.

The plaintiff has shown a substantial likelihood of irreparable injury if preliminary relief is not granted. As the Court noted in its previous Orders, "[s]peculative injury is not sufficient [to make a clear showing of irreparable harm]; there must be more than an unfounded fear on the part of the applicant." Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985); see Wis. Gas Co. v. F.E.R.C., 758 F.2d 669, 674 (D.C. Cir. 1985) ("[Irreparable] injury must be both certain and great; it must be actual and not theoretical."). Where the injury is merely "financial" and "monetary compensation will make [the plaintiff] whole if [the plaintiff] prevails on the merits," there is no irreparable injury. Bluefield, 577 F.3d at 253. But when the nature of economic "rights makes 'establishment of the dollar

---

[6] Courts in circumstances more remote than in this case have, with approval, imported time-sensitive mandates into statutes that were silent as to time. See In re Am. Rivers & Idaho Rivers United, 372 F.3d 413, 418-20 (D.C. Cir. 2004) (finding the Federal Energy Regulatory Commission lacked the discretion not to act on a petition and requiring that it act within forty-five days).

value of the loss . . . especially difficult or speculative,'" a finding of irreparable harm is appropriate.  Allied Mktg. Group, Inc. v. CDL Mktg., Inc., 878 F.2d 806, 810 n.1 (5th Cir. 1989) (quoting Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 630 n.12 (5th Cir. 1985)).  The rights involved here are more than economic: the plaintiff's operations in the Gulf of Mexico are threatened with endless disability.  It has already sent a rig to French Guiana; its contracts and skilled labor necessarily will follow.

The plaintiff has also shown the threatened injury outweighs any harm that will result to the government if preliminary relief is granted and that the injunction will not disserve the public interest.  As the first anniversary of the Deepwater Horizon disaster draws near, any reason that would have justified delays has, under a rule of reason, expired.  Beginning to process permit applications will restore normalcy to the Gulf region and repair the public's faith in the administrative process.  See TRAC, 750 F.2d at 79 ("The delay[s] at issue threaten the [government's] credibility.").

The Court concludes that the government's inaction on the five permits identified by the plaintiff justifies the grant of a preliminary injunction.

IV.

The Court therefore ORDERS that BOEMRE is required to act on

16

the five pending permit applications within thirty days of this Order and simultaneously report to the Court its compliance. Ensco's application for a preliminary injunction meets all the requirements of Rule 65 of the Federal Rules of Civil Procedure and is GRANTED.

New Orleans, Louisiana, February 17, 2011.

MARTIN L.C. FELDMAN
UNITED STATES DISTRICT JUDGE