UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ENSCO OFFSHORE CO., ET AL                    CIVIL ACTION

VERSUS                                       NO. 10-1941

KENNETH LEE "KEN" SALAZAR,                   SECTION "F"
ET AL

<u>ORDER & REASONS</u>

This is the next chapter in the saga of the status of deepwater drilling in the Gulf of Mexico after the infamous April 2010 BP oil spill, known otherwise in some quarters as the government's de facto drilling moratorium. What we read in the last chapter was a story of the disquieting spectre of the government's questionable conduct regarding its portrayal of important facts, and an earnest challenge to resolute governmental abuse.

This chapter tells a different story. It visits the arcane depths of administrative law and the extent to which the United States Supreme Court's <u>Chevron</u> test, coupled with the Administrative Procedure Act, confines this Court's statutory duty of judicial review of charges of federal regulatory agency abuse.

Before the Court are narrowly focused cross-motions for summary judgment on Counts V and VI of the plaintiffs' second amended complaint. The plaintiffs' motion is DENIED. The government's motion is GRANTED in part and DENIED in part.

**Background**

In their second amended complaint, the plaintiffs challenge the government's application of two regulations each of which have been in place for more than a decade.  Together, these challenges allege that the government exceeded its authority under the Outer Continental Shelf Lands Act (OCSLA) and the Administrative Procedure Act (APA) by requiring both (1) Development Operations Coordination Documents (DOCDs) and (2) applications for permits to drill in connection with production and development activities in areas of the Gulf of Mexico not adjacent to the State of Florida. The plaintiffs seek an order holding unlawful, setting aside, and permanently enjoining enforcement of these regulations.

Count V of the plaintiffs' complaint attacks the requirement that operators prepare DOCDs in connection with development and production activities in the western Gulf of Mexico.  The plaintiffs contend that the DOCD requirement essentially amounts to a requirement that the plaintiffs prepare what is known as a development and production plan (DPP), which, they allege, may be imposed only in the Florida Gulf under OCSLA.  In imposing a DPP-like requirement outside of the Florida Gulf, the plaintiffs contend that the government has exceeded its statutory authority.

The government concedes that requiring the submission of a DPP or a DOCD serves the same purpose and that each document provides BOEMRE with similar information.  To illustrate, under Interior's

regulations, both the DPP and DOCD must describe the anticipated rate of production, technology and practices that would be used to ensure optimal recovery of oil and gas, environmental safeguards that would be implemented under the plan, and the measures taken to meet all applicable safety standards.  <u>See</u> 30 C.F.R. § 250.241-.250, .252-.267, .269-.286.  Indeed, the regulations governing the two often are identical and begin with some variation on the command, "Your DPP or DOCD must include the following. . . ."  <u>See</u> 30 C.F.R. § 250.241.

But, the government touts, the documents are not identical: DOCDs in the western Gulf of Mexico are less demanding than the Florida Gulf's DPPs, both substantively and procedurally.  The regulations require that DPPs, but not DOCDs, "provide a timetable for acquiring lands . . . and constructing or expanding any of the onshore support facilities." 30 C.F.R. § 250.258(a)(2). "At least once in each OCS planning area," moreover, "the Director will declare that the approval of a proposed DPP," but not the approval of a proposed DOCD, "is a major Federal action, and [BOEMRE] will prepare an [environmental impact statement]."  30 C.F.R. § 250.269(a).  And, Interior has exercised its authority under 30 C.F.R. § 250.201(c), to exempt DOCDs, but not DPPs, from requirements that would otherwise apply under the regulations.[1]

_____

[1]  These include the chemical products disclosure requirement in 30 C.F.R. § 250.243(d); the stratigraphic column, time-versus-depth chart, geochemical information, and future

3

See NTL No. 2006-G14 at 6-7, 12, 19, 23.[2]

The regulations underlying this challenge were amended in 1984 to allow what is now BOEMRE to require preparation of DOCDs by lessees in the western Gulf of Mexico. See Final Rule: Oil & Gas & Sulphur Operations in the Outer Continental Shelf, 48 Fed. Reg. 55565 (Dec. 14, 1983); see also Final Rule: Oil & Gas & Sulphur Operations in the Outer Continental Shelf; Outer Continental Shelf Minerals & Rights-of-Way Management, General; & Outer Continental Shelf Orders for All Regions of the Outer Continental Shelf, 53 Fed. Reg. 10596, 10608 (Apr. 1, 1998) (explaining decision to retain DOCD requirement in the western Gulf). The plaintiffs concede that this requirement has been previously applied to their activities in the western Gulf, but assert that the pending challenge targets the government's recent application of the DOCD requirement in the western Gulf of Mexico after the Deepwater Horizon catastrophe. Plaintiffs charge intentional delay and an

_____

geological and geophysical activities requirements in chart, geochemical information, and future geological and geophysical activities requirements in 30 C.F.R. § 250.244(h)-(k); the projected cooling water intakes and National Pollutant Discharge Elimination System permit information requirements in 30 C.F.R. § 250.248(c), (e); the decommissioning information requirements in 30 C.F.R. § 250.255; the drilling fluids and chemical products transportation information requirement in 30 C.F.R. § 250.257(c); and the air emissions and unusual and solid liquid wastes information requirement in 30 C.F.R. § 250.258(b), (c).

[2] This NTL was superseded on May 1, 2008, but its successor, NTL No. 2008-G04, provides the same exemptions.

arbitrary and capricious crafting of post-BP spill regulatory
rules:

- The government rescinded previously-
  approved DOCDs and is requiring ATP to go
  through the approval process again—
  something the government has not done
  before.

- The government imposed new requirements
  which must be met before a DOCD is
  approved; specifically, plaintiffs
  complain, NTL-06 requires BOEMRE to no
  longer use categorical exclusions with
  respect to National Environmental Policy
  Act review for DOCDs.

- The government is taking substantially
  longer to review and approve DOCDs.

Count VI separately challenges as unlawful the government's
requirement that each lessee obtain drilling permits for
development and production drilling. The plaintiffs contend that
OCSLA authorizes a permit requirement only in connection with
exploration drilling pursuant to an approved exploration plan. The
regulations, in contrast, require the approval of an application to
drill under not only an exploration plan, but also under a DPP and
a DOCD.  30 C.F.R. § 250.281.

The regulations complained of in Count VI were amended in 1998
to require submission of an application for a permit to drill prior
to the initial drilling of a well under an approved DPP or DOCD.
See 53 Fed. Reg. at 10710, 10722.  Again, the plaintiffs concede
that this regulation has been previously applied to their
activities in the western Gulf, but they assert that it has been

applied to them in a novel way in the last several months.  As with the DOCDs challenged in Count V, the plaintiffs claim that the government has rescinded previously-approved permits, has imposed new permitting requirements, and is taking much longer to review and approve permit applications than in the past.  (This Court has previously held that Interior must act on permit applications within a reasonable time, which the Court defined as within thirty days.)

Now, the plaintiffs and the government move for summary judgment on Counts V and VI.  Resolution of these motions turns first on a question of statutory interpretation.

## Law & Analysis

### I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that mere argued existence of a factual

dispute does not defeat an otherwise properly supported motion: "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). It must instead come forward with competent evidence, such as affidavits or depositions, to buttress its claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). In evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

Because here the Court evaluates an administrative agency's construction of a statute that it administers, its analysis is governed by the two-step test announced in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Chevron speaks to the parameters of this Court's statutory duty of judicial review.

The Supreme Court instructs that "[r]egardless of how serious

7

the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000) (quoting ETSI Pipeline Project v. Mo., 484 U.S. 495, 517 (1988)). Under Chevron's first step, recognizing that both courts and administrative agencies "must give effect to the unambiguously expressed intent of Congress," the high court requires this Court to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842-43.  "If," upon examination of the statute, the Court finds that "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.

To expand, if the Court, "employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id. at 843 n.9.  The Court's inquiry under this first step therefore begins, and often ends, with the text of the statute.  See id. ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

"In determining whether Congress has specifically addressed the question at issue," however,

> [A] reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning-or ambiguity-of certain words or phrases may only become evident when placed in context. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (internal citations & quotations removed).

But, if "the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute." Chevron, 467 U.S. at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Chevron's second step, in which "the question for the court is whether the agency's answer is based on a permissible construction of the statute."[3]

_____

[3] "Mere ambiguity" or silence alone, however, "is not evidence of congressional delegation of authority." Texas v. United States, 497 F.3d 491, 502 (5th Cir. 2007). In cases where a statute is broad and delegates much authority to an agency, silence may indicate an ambiguity or gap that must be addressed under Chevron's second step. However, in a statute laying out a "meticulous description" of the administrative scheme, silence may reveal congressional intent to preclude certain interpretations, therefore commanding the Court's resolution under Step One. In latter cases, "Congress has directly addressed the extent of authority delegated to an administrative agency, [and] neither the agency nor the courts are free to assume that Congress intended the [agency] to act in situations left unspoken." Courts are charged to "recognize an implicit delegation of rulemaking authority only when Congress has not

Id.; see Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004).

Ultimately, then, an agency's interpretation is "permissible" so long as it is reasonable.  Babbitt v. Sweet Home Chapter of Cmties. for Greater Or., 515 U.S. 687, 703 (1995); see ConocoPhillips Co. v. U.S. E.P.A., 612 F.3d 822, 831 (5th Cir. 2010).  In cases guided by the APA (like this one), an agency's construction is reasonable when it is not "arbitrary, capricious, or manifestly contrary to the statute."  612 F.3d at 839.  Under this standard, "[t]he scope of the reviewing court's inquiry is to determine if the agency's judgment conforms to minimum standards of rationality, i.e., whether the agency act bears a rational relationship to the statutory purposes, and whether there is substantial evidence in the record to support it."  Id. at 832.  In making this determination, the Court should be mindful that

> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.  If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or

---

spoken directly to the extent of such authority, or has 'intentionally left [competing policy interests] to be resolved by the agency charged with administration of the statute.'" Id. at 503 (quoting Chevron, 467 U.S. at 865-66).

> manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Chevron, 467 U.S. at 843-44 (internal citations, quotations, & footnotes omitted). Precedent limits this Court's statutory interpretation:

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges-who have no constituency-have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

Id. at 846 (quoting TVA v. Hill, 437 U.S. 153, 195 (1978).

And this Court's duty is to be faithful to these precedential limits, even if the government has caused an essential national energy asset to wither. The Court turns now to the text of the statute.

### III.

Congress enacted OCSLA in 1953, and amended it significantly in 1978. See Pub. L. No. 95-372, 92 Stat 629 (Sept. 18, 1978). As amended, OCSLA establishes a national policy to make the Outer Continental Shelf "available for expeditious and orderly

11

development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3).  OCSLA instructs that

> [O]perations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.

Id. § 1332(6).

OCSLA separates offshore leasing into four distinct phases: (1) the Department of Interior's formulation of a five-year leasing plan; (2) lease sales; (3) exploration by the lessees; (4) development and production.  Sec'y of Interior v. Cal., 464 U.S. 312, 337 (1984).  "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lessees of rights to conduct additional activities on the OCS.  And each stage includes specific requirements for consultation with Congress, between federal agencies, or with the States."  Id.

Relevant to the Court's inquiry here are the third stage, exploration, and the fourth stage, development and production.  Under OCSLA, "exploration" is

> [T]he process of searching for minerals, including (1) geophysical surveys where magnetic, gravity, seismic, or other systems are used to detect or imply the presence of

12

> such minerals, and (2) any drilling, whether on or off known geological structures, including the drilling of a well in which a discovery of oil or natural gas in paying quantities is made and the drilling of any additional delineation well after such discovery which is needed to delineate any reservoir and to enable the lessee to determine whether to proceed with development and production.

43 U.S.C. § 1331(k).

"Development" is defined as "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered." Id. § 1331(l). "Production" comprises "those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and workover drilling." Id. § 1331(m).

From these definitions, it is obvious that at both the exploration phase and the development and production phase, OCSLA contemplates drilling.

OCSLA provides that at the exploration stage, a lessee submits, and BOEMRE approves, an exploration plan. See 43 U.S.C. § 1340. "Exploration may not proceed until an exploration plan has

been approved."[4]   464 U.S. at 339.

In the provision governing this phase, OCSLA provides that "[t]he Secretary may, by regulation, require any lessee operating under an approved exploration plan to obtain a permit prior to drilling any well in accordance with such plan." Id. § 1340(d). The statute further instructs that

> Any permit for geological explorations authorized by this section shall be issued only if the Secretary determines, in accordance with regulations issued by the Secretary, that—(1) the applicant for such permit is qualified; (2) the exploration will not interfere with or endanger operations under any lease issued or maintained pursuant to this subchapter; and (3) such exploration will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance.

Id. § 1340(g).

The fourth and final stage of the leasing process, development and production, occurs if oil or gas is discovered in paying

---

[4] Under the statute's terms, the exploration plan "shall include, in the degree of detail which the Secretary may by regulation require-(A) a schedule of anticipated exploration activities to be understaken [sic]; (B) a description of equipment to be used for such activities; (C) the general location of each well to be drilled; and (D) such other information deemed pertinent by the Secretary." Id. § 1340(c)(3).  A lessee may proceed only if the Secretary finds that its exploration plan "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance." 43 U.S.C. § 1340(g)(3).

quantities during exploration.   43 U.S.C. § 1351.   This phase
requires the lessee to submit a different plan—the development and
production plan (DPP)—to the Department of Interior in most cases.
464 U.S. at 340.   If Interior finds that the plan would "probably
cause serious harm or damage . . . to the marine, coastal or human
environments," then the plan—and leasing program—may be terminated.
Id. § 1351(h)(1)(D)(I).   OCSLA does not mandate application of a
DPP requirement on Gulf of Mexico leases, see id. § 1351(a), but
grants the Secretary authority to impose the requirement in the
Florida Gulf in his discretion.[5]   See id. § 1351(l).   The statutory
provision directly governing this phase makes no mention of
permits.   See id. § 1351.

      But, the statute more broadly directs the Secretary of
Interior to

            prescribe such rules and regulations as may be
            necessary to carry out [leasing] provisions.
            The Secretary may at any time prescribe and
            amend such rules and regulations as he
            determines to be necessary and proper in order
            to provide for the prevention of waste and
            conservation of the natural resources of the
            outer Continental Shelf, and the protection of
            correlative      rights      therein,      and,
            notwithstanding any other provisions herein,
            such rules and regulations shall, as of their

_____

      [5]   The regulations define the "Eastern Gulf of Mexico" as
"all OCS areas of the Gulf of Mexico the Director decides are
adjacent to the State of Florida" (what the Court refers to as
the Florida Gulf throughout this Order) and the "Western Gulf of
Mexico" as "all OCS areas of the Gulf of Mexico except those the
Director decides are adjacent to the State of Florida."   30
C.F.R. § 250.105.

> effective date, apply to all operations
> conducted under a lease issued or maintained
> under the provisions of this subchapter.

43 U.S.C. § 1334(a).  The regulations the Secretary is expressly authorized to enact include those "for drilling or easements necessary for exploration, development, and production," ones "for the prompt and efficient exploration and development of a lease area," and regulations to comply with certain Clean Air Act requirements.  Id. § 1334(a)(6)-(8).  "The issuance and continuance in effect of any lease, or of any assignment or other transfer of any lease, under the provisions of this subchapter," moreover, "shall be conditioned upon compliance with regulations issued under [Section 1334]."  Id. § 1334(b).

Finally, other statutes influence BOEMRE's enforcement role. The National Environmental Policy Act, for example, requires agencies, to varying degrees, to evaluate the effects of their actions on the environment.  See 42 U.S.C. §§ 4321, et seq.  The Coastal Zone Management Act also imposes procedural and substantive requirements on federal actions which affect natural resources within a state's coastal zone.  See 16 U.S.C. §§ 1451, et seq.

IV.

The plaintiffs' grievance is two-fold:  in Count V, they claim that the government has impermissibly imposed a DPP requirement in the western Gulf by requiring preparation of a DOCD; in Count VI, they complain that the government has unlawfully imposed a

16

permitting requirement at the development and production phase. See 30 C.F.R. §§ 250.281(a)(1), 250.410. These claims are predicated on the plaintiffs' assertions that the government has recently rescinded previously-approved DOCDs and permits, and returned the plaintiffs to the beginning of the approval process; that the government has imposed new requirements which must be met before a DOCD or permit is approved; and that the government is taking substantially longer to review and approve DOCDs and permits.[6]

A.

In support of their Count V attack, the plaintiffs assert that Interior's discretion to impose a DPP requirement in the Gulf extends only to the portion of the Gulf adjacent to Florida. And although Interior has not imposed an express DPP requirement in the western Gulf, it has imposed the DOCD requirement, which, plaintiffs urge, is simply a DPP in disguise; they urge that the DOCD and DPP requirements are identical and are governed by the same regulations. The plaintiffs further assert that OCSLA provides Interior no other authority to impose such a requirement for activities conducted in areas outside of the Florida Gulf.

_____

[6] This claim is partly related to, but is separate from, the plaintiffs' claim in Count IV, which alleges the government has unlawfully delayed the permitting process. The time-sensitive issue has been ruled upon earlier by this Court and is presently on appeal. It is not the subject of these cross-motions.

Turning to Count VI, the plaintiffs assert that OCSLA empowers Interior only to require permits before drilling a well under an approved exploration plan.  Because this authority does not extend to development and production activities, plaintiffs say, Interior's requirement that permits must issue prior to development and production activities is therefore invalid.

B.

As to Count V, the government stresses that DPPs and DOCDs differ significantly, in scope and applicability, for reasons owing to the manner in which this stage of OCSLA's process evolved after passage of OCSLA's 1978 amendments.  Since 1954, the government explains, Interior had required, through rulemaking, that all lessees on the OCS submit DPPs or their functional equivalent after discovering minerals in paying quantities.  The 1978 amendments were not intended to displace these requirements, the government asserts, but instead were designed to extend them to other areas of the Outer Continental Shelf.  The government concedes that DOCDs are subject to many of the same requirements as DPPs, but stresses that these requirements are not identical.  It, of course, maintains the validity of its regulations.

With respect to Count VI, the government responds that the permitting process applies with equal force to wells drilled under an exploration plan, DPP, or DOCD—and has for a long time.  As with DPPs, the government asserts, Interior has required since 1954 that

18

lessees obtain approval of drilling permits prior to drilling for production any well on the OCS.  The Secretary of the Interior and, by delegation, BOEMRE's Director, have relied on the information presented in DPPs and DOCDs since 1954 to administer the various provisions of the OCSLA, including the mandate to ensure the conservation of natural resources and the prompt and efficient development of leases.

V.

The Court concludes that plaintiffs' arguments fail on Count VI.[7]  Count VI is resolved at <u>Chevron</u>'s second step.  In addressing Count V, the Court is faced with an obstacle, which necessitates more factual development:  whether the new delays posed by the DOCD requirement amount to an intentional delay.

A.

Reviewing OCSLA's text, the Court can say that Congress's intent regarding the DOCD requirement in the western Gulf is either silent or ambiguous and therefore requires this Court to consider the reasonableness of the agency's construction under <u>Chevron</u>'s

---

[7]  Despite the plaintiffs' assertions that their challenge is to the regulations as they are currently applied to their activities, their arguments remarkably seem to focus on the facial validity of the regulations themselves.  The Court has, in an earlier decision, denied the government's motion to dismiss Counts V and VI on sovereign immunity grounds, finding these claims were not time-barred because they offer an as-applied challenge based on events that have unfolded in the wake of the Deepwater Horizon disaster.  The Court is mindful of its prior Order, and of the necessarily limited permissible scope of the plaintiffs' challenge, in resolving these cross-motions.

second step.  To explain:  The narrow text of OCSLA seemingly disregards a DPP requirement in the western Gulf of Mexico.  See 43 U.S.C. § 1351(l).  A review of the statute as a whole, however, arguably reveals a scheme in which a DOCD requirement in the western Gulf is neither impliedly contemplated nor is expressly precluded.[8]  The question, then, would be whether the DOCD requirement in the western Gulf is reasonable.  As has been observed, Interior is specifically authorized to enact regulations related to drilling necessary for both exploration, development, and production purposes, as well as those to ensure prompt and efficient exploration and development of leases.  43 U.S.C. § 1334(a)(6).  But what is "necessary" is not clear from the text of the statute.[9]

Finding unclear guidance within the statute, the Court, turning to Chevron's second step, might not be constrained to observe that it is not implausible that the Secretary would use his

_____

[8]  And although "mere ambiguity" or silence alone is not enough to consider whether deference is owed under Chevron's second step, one could argue that OCSLA's broad grant of regulatory power to the Department of Interior reveals that congressional silence did not amount to a determination that DOCDs were entirely improper in the western Gulf.  See Texas, 497 F.3d at 502.

[9]  It is clear that OCSLA confers broad regulatory authority and discretion upon Interior.  Its limitations come outside of the statute by way of the procedural requirements imposed by the APA and the NEPA.  It was the government's failure to comply with the APA by failing to act on permit applications that led this Court to grant a preliminary injunction on February 17, 2011.

regulatory authority over drilling in exploration, development, and production activities to impose a DPP-like requirement in the western Gulf.  The government maintains that DOCDs are an efficient and effective way for operators and BOEMRE to ensure all statutory requirements are met.  The requirement seems to date to 1983 and has been continuously retained since that time.[10]  However, the Court cannot grant either cross-motion for summary judgment on this issue.  The plaintiffs' as-applied challenge posits that the government has intentionally used the DOCD requirement to delay drilling in the western Gulf.  This question of intentional delay injects unresolved factual doubts into the Court's considerations, and amounts to an issue of material fact unable to be resolved at the level of summary relief.  If intentional, the delays that a more recently onerous DOCD requirement creates could render the government's requirement an unreasonable construction of its power under OCSLA—an interpretation so unreasonable as not to deserve this Court's deference.  On the other hand, the Court cannot say that standing alone, without the backdrop of intentional delay, a DPP-like requirement in the western Gulf is "arbitrary, capricious, or manifestly contrary to the statute."  <u>Conoco-Phillips</u>, 682 F.3d at 839.

B.

Count VI cannot survive <u>Chevron</u>'s second step scrutiny.  The

---

[10]   <u>See</u> 48 Fed. Reg. 55565; 53 Fed. Reg. 10608-10609.

statutory text is not entirely silent on the issue of permits.  At a glance, OCSLA's provision on exploration authorizes the issuance of a permit for any drilling in accordance with an approved exploration plan.  See 43 U.S.C. § 1340(d).  The statute provides for determinations which must occur before permits are issued.  See id. § 1340(g).  The express language limits the grant of permits to activities under an exploration plan.  See id.  But in the multi-stage cumulative drilling process envisioned by OCSLA, although the statute is equivocal, it is not unreasonable to posit that any drilling occurring after an exploration plan is approved—drilling related to exploration, development, or production—could fall within this provision's grant.  See Sec'y of Interior v. Cal., 464 U.S. at 337.[11]

Thus the Court looks to Chevron step two as it did with Count V.  OCSLA imbues Interior with the authority to enact regulations that inextricably intertwine with drilling in the development and production phase.  Id. § 1334(a)(6).  This broad authority justifies the conclusion that the agency's construction of OCSLA is not unreasonable.

---

[11]  As with Count V, the Court sees one limitation: the plaintiffs' claim of intentional delays.  Count VI differs from Count V, however, because the issue of delay has been addressed by this Court and currently is on appeal to the Fifth Circuit. With that issue now outside of this Court's review, the Court resolves Count VI on the record currently before it.  This Court believes, and has held, a permit requirement is not unreasonable, but permit applications must be acted upon within thirty days.

VI.

Because the Court concludes that the regulations challenged under Counts V and VI of the plaintiffs' second amended complaint are targeted by <u>Chevron</u>'s analytical framework, the government's motion is GRANTED as to Count VI and DENIED as to Count V; the plaintiffs' motion is DENIED.

New Orleans, Louisiana, April 6, 2011.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE